## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNETTE STRAUB, | : | CIVIL NO.: 1:25-cv-00078 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FRANK BISIGNANO,[1] | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.  Introduction.

In this social security action, Plaintiff Annette Straub seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act.  We have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons set forth below, we

---

[1] Frank Bisignano is now the Commissioner of Social Security, and he is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

will vacate the Commissioner's decision and remand the case to the Commissioner for further proceedings.

## II. Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 9-1 to 9-8.*[2] On July 29, 2021, Straub filed an application for disability insurance benefits and an application for supplemental security income, alleging that she has been disabled since April 1, 2013. *See Admin. Tr.* at 194–210.  After the Commissioner administratively denied her claims, *id.* at 115–35, Straub requested an administrative hearing, *id.* at 136–38.  On November 15, 2023, Straub—appearing without counsel—as well as a vocational expert testified at a hearing before Administrative Law Judge Howard Kauffman (the "ALJ"). *Id.* at 42–65.

On February 13, 2024, the ALJ denied Straub's claims for benefits. *Id.* at 20-40.  Straub appealed the ALJ's decision to the Appeals Council, which denied her request for review. *Id.* at 1–6.  This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In January 2025, Straub, now represented by counsel, began this action by filing a complaint seeking review of the Commissioner's decision denying her

---

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Straub's claims.

2

claims. *See Doc. 1*.  She requests that the court reverse the Commissioner's decision and award her benefits or, in the alternative, remand the case for further proceedings. *Id*. ¶ 14 (Wherefore Clause).  She also seeks "such relief" as the court deems justified, including attorney's fees. *Id*.

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 7*.  The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 8, 9*.  The parties filed briefs, *see docs. 14, 15, 18*, and this matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 587 U.S. at 103.  Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Straub is disabled, but whether substantial evidence supports the Commissioner's finding that she is not disabled and whether the Commissioner correctly applied the relevant law.

4

## B.  Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II or Title XVI of the Social Security Act, a claimant generally must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. §1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).

Further, to receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[3]  Unlike with disability insurance benefits under Title II of the Social Security Act,

---

[3] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)).  "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id*. (citing 42 U.S.C. § 416(i)(2)).  Here, the ALJ determined that Straub met the insured-status requirements through September 30, 2016. *Admin. Tr.* at 24, 26.

"[i]nsured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits" under Title XVI of the Social Security Act. *Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar. 22, 2017).  Supplemental Security Income "is a federal income supplement program funded by general tax revenues (not social security taxes)" "designed to help aged, blind or other disabled individuals who have little or no income." *Id*.

The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a).  Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20

C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).  But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the

reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV. The ALJ's Decision.

On February 13, 2024, the ALJ denied Straub's claims for benefits. *Admin. Tr.* at 20–40. He proceeded through the five-step sequential-evaluation process.

### A. Step One.

At step one of the sequential-evaluation process, the ALJ found that Straub had not engaged in substantial gainful activity since her alleged onset date of April 1, 2013. *Id.* at 26.

### B. Step Two.

At step two of the sequential-evaluation process, the ALJ found that Straub had the following severe impairments: degenerative disc disease and migraine headaches. *Id*. He also found that Straub's obesity and diabetes mellitus, were non-severe medically determinable impairments. *Id*.

The ALJ further determined that Straub's depression and anxiety were non-severe medically determinable impairments, and with regard to these mental impairments, he considered the four broad areas of mental functioning set forth in

the disability regulations for evaluating mental disorders[4] and in the listings,

known as the paragraph B criteria.[5]  He concluded that Straub had no limitation in

understanding, remembering, or applying information; no limitation in interacting

with others; mild limitation in concentrating, persisting, or maintaining pace; and

mild limitation in the adapting or managing oneself. *Id*. at 27.

In making those findings, the ALJ considered Straub's medical records

regarding her mental impairments. *Id*.  He acknowledged that Straub's "medical

record shows [she] received psychotropic medications for depression and anxiety

---

[4] When "mental impairments are at issue, additional inquiries are layered on top of the basic five-step disability analysis." *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 202 (3d Cir. 2019).  The regulations set forth a "special technique" used for evaluating mental impairments. *See* 20 C.F. R. § 404.1520a.  As part of that "special technique," a claimant's degree of functional limitation is rated in four broad functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id*. at § 404.1520a(c)(3).  A claimant's degree of limitation in these functional areas is rated using "the following five-point scale: None, mild, moderate, marked, and extreme." *Id*. at § 404.1520a(c)(4).  The ratings in these four broad functional areas are used at Step 2 to determine if the claimant has a severe mental impairment, and if the claimant has a severe mental impairment, the ratings are also used at Step 3 to determine if the claimant's severe mental impairment meets or equals a listed mental disorder. *Id*. at § 404.1520a(d).

[5] The listings for mental disorders contain either two paragraphs (A and B) or three paragraphs (A, B, and C). *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00.A.2.  Except as to Listing 12.05 (intellectual disorder), paragraph B of each of the listings for the mental disorders sets forth the same four functional criteria as set forth in 20 C.F. R. § 404.1520a, and the listings use the same five-point rating scale as those regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00.A.2.b, 12.00.E, 12.00.F.  This is what the ALJ is referring to when he refers to the paragraph B criteria.

from her primary care physician prior to November 2022." *Id.* "At that time, [Straub] began treating with outpatient psychiatry for psychiatric medication management." *Id.* But, the ALJ concluded, Straub's "treatment records demonstrate that despite her impairments, [she] continued to present with unremarkable findings on psychiatric mental status examinations[,]" and "her treatment records note that her conditions remain well-controlled and stable." *Id.*

The ALJ also considered Straub's statements concerning her limitations and her activities of daily living, concluding that her activities support his finding of no or mild limitations in the paragraph B categories of functioning:

> Despite [Straub]'s allegations regarding her mental health impairments causing her difficulty with remembering information, completing tasks, and concentrating, [Straub] admitted in the record that she has no difficulty remembering to take care of her own personal needs and grooming. Both [Straub] and her husband further admitted she retains the ability to prepare daily meals, clean her home, launder clothes, vacuum floors, drive a car, travel independently, shop in stores, manage personal and household finances, and engage in daily social activities. That [Straub] is capable of preparing meals suggests [she] is capable of following simple instructions consistent with a recipe or package directions. That [Straub] can shop in stores for groceries suggests [she] is capable of identifying purchase needs, making a list, selecting food items, managing money, and interacting appropriately with checkout personnel. That [Straub] is capable of performing routine household activities such as laundering clothes, cleaning, and vacuuming floors suggests [she] is capable of sustaining the attention and concentration necessary to perform and complete the[se] simple activities and remains able to utilize simple machinery safely. Additionally, [Straub]'s participation in social activities

10

suggests [she] has a good capacity for maintaining relationships and acting appropriately in public.  That [Straub] is able to travel independently and drive a car suggests [she] is capable of making a travel plan, executing the plan, and adapting to changes and variables in the situation including other drivers on the road, road closures, or changed travel schedules.  These activities suggest [Straub] retains a greater capacity for cognitive, social, executive, and adaptive skills than alleged in connection with their disability application and appeal and do not suggest a degree of impairment consistent with any limitation in understanding, remembering information, applying information, or maintaining social functioning and no more than a mild limitation in concentration, persistence, pace, adaptation, or self-management.

*Id*.

In making these findings, the ALJ also considered opinion evidence. *Id*. at 28.  He considered and found persuasive the opinions of the state agency psychological consultants, who determined that Straub's "mental health impairments do not result in more than mild limitations in any area of work-related cognitive, social, executive, or adaptive functioning." *Id*.  The ALJ explained that these "assessments are consistent with [Straub]'s treatment records, containing little evidence to suggest moderate limitations i[n] daily activity functioning, social skills, executive capacities, or adaptability." *Id*.  He also determined that "[t]he assessments are also well-supported [by] [Straub]'s clinical record, prognostic expectations, and functioning, particularly [her] repeated treating psychiatric mental status examinations, showing little evidence of any significant functional abnormality." *Id*.

11

The ALJ further considered the opinion of Dr. Kathleen Ledermann, a consultative psychological examiner who performed a mental status evaluation[6] on Straub on May 16, 2022. *Id*.  The ALJ noted that Dr. Ledermann opined that Straub has "moderate-to-marked difficulties performing complex work tasks and making judgments on complex work-related decisions due to memory problems observed on mental status examination." *Id*.  The ALJ stated that "[w]hile Dr. Ledermann's assessment may have been consistent with her findings on examination that one day, [Straub]'s treatment record shows little evidence of any continuing deficits in [her] attention, concentration, memory, insight, judgment, or cognition." *Id*.  The ALJ also stated that "Dr. Ledermann noted the assessed limitations were likely the result of [Straub's] physical pain, secondary to degenerative disc disease and spinal stenosis[.]" *Id*.  Thus, according to the ALJ, they "do not constitute limitations on the basis of any psychopathology." *Id*. "Moreover," the ALJ determined that "the assessment is poorly supported by [Straub]'s own admissions in the record regarding her retained capacity for sustained daily activities." *Id*.

"Because [Straub]'s medically determinable mental impairments cause no more than 'mild' limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in [Straub]'s ability

---

[6] *See Admin. Tr.* at 1260–71.

to do basic work activities," the ALJ concluded Straub's mental impairments are non-severe impairments. *Id*. at 27.  The ALJ recognized that the paragraph B criteria are not an RFC; rather, they "are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process[,]" and the RFC "assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." *Id*. at 28.  And he asserted that the RFC that follows "reflects the degree of limitation" he "has found in the 'paragraph B' mental function analysis." *Id*.

### C.  Step Three.

At step three of the sequential-evaluation process, the ALJ found that Straub did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 28–29.  Specifically, with regard to Straub's degenerative disc disease, the ALJ considered Listing 1.15. *Id*. at 28.

The ALJ also stated that "[t]here is no Listing for migraine headaches," but "pursuant to Social Security Ruling 19-4p, [he] considered [Straub]'s headaches under equivalence to Listing 11.02." *Id*.  And he determined:

> The record does not provide sufficient information regarding the frequency or presentation of [Straub]'s headaches to demonstrate symptoms equivalent to the requirements of Listing 11.02.  Additionally, no medical source opined

> [Straub]'s headaches were equivalent in severity to Listing
> 11.02; [Straub] does not allege equivalence to the Listing; and
> there is insufficient evidence to suggest an opinion on
> equivalence to Listing 11.02 need be developed.

*Id*. at 28–29.

### D.  The RFC.

The ALJ then determined that Straub had the RFC to do sedentary work[7]

with some limitations. *Id*. at 29.  He concluded that Straub "can only occasionally

climb ramps/stairs, balance, stoop, kneel, crouch, and crawl"; she "can never climb

ladders/ropes/scaffolds"; she "can tolerate no concentrated exposure to extreme

cold, extreme heat, wetness, humidity, vibration, fumes, dusts, gases, odors, poor

ventilation, unprotected heights, and moving machinery parts"; and she "can

tolerate Selected Characteristics of Occupations (SCO) noise levels of no greater

than 3." *Id*.

In making this RFC assessment, the ALJ considered Straub's testimony and

assertions regarding her limitations as well as the statement by her husband. *Id*. at

29–30.  The ALJ concluded that although Straub's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms[,]" her

---

[7] *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

"statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id*. at 30.

The ALJ also considered Straub's medical records. *Id*. at 30–32.  In addition to the medical records relevant to her degenerative disc disease, the ALJ considered the records relating to her migraines:

> The record also demonstrates [Straub] is diagnosed with migraine headaches.  In June 2018, [Straub] presented to the emergency department with complaints of headache attenuated [sic] by pain, nausea, vomiting, and facial numbness.  CT imaging of [Straub]'s head was normal.  [Straub] was administered an intramuscular injection of Toradol, Reglan, and Benadryl and was discharged to home with improvement in her pain shortly thereafter.
>
> In March 2019, [Straub] also presented for an acute care visit reporting symptoms of headache for one week.  She noted her pain was intermittent and that she had been taking ibuprofen for her pain.  However, records show [Straub] was provided treatment and medication only for her associated cough.
>
> By November 2019, [Straub] was sent for an MRI of her brain due to continued complaints of headaches; however, the imaging showed no evidence of intracranial abnormality. [Straub] was prescribed abortive and preventative medications for migraine symptoms and records show that while she continued to have regular headache days, [she] reported having no further migraine symptoms until January 2021, when she experienced a change in her presentation following sinus

15

surgery.[8]  Follow-up records show some continued changes in [Straub]'s abortive and preventative medications, and by

---

[8] The medical record cited by the ALJ for this assertion provides:

Ms. Straub is a 32 y/o female with PMH DM, HLD, headaches, depression, anxiety, IBS, following up with Neurology through VIDEO VISIT for chronic migraine, migraine with aura, intractable, wo status migrainosus.  Her headaches have overall significantly improved and are now episodic migraines, migraines with aura, not intractable, without status migrainosus. I think her symptoms which occurred on Nov 29, 2019 were likely migraines with aura since she states that she has had right face, arm numbness/weakness prior to the onset of headache, though difficulty getting words out was new this time.  No further episode since Nov. 29, 2019.

*Admin. Tr*. at 1094.  Two pages of the medical record later, an explanation of what

occurred on November 29, 2019 is provided:

Briefly, on Nov 29, 2019, she went . . . grocery shopping[.] [W]hen she got home, she went to get a drink, [and] her eyes got blurry, [the] right side of [her] face and arm started going numb with weakness, followed by difficulty getting words out[.]  [S]he had trouble putting words together, her words weren't making sense[.]  [S]he states that she couldn't even hold a pen in her right hand[.]  [S]he starting getting a headache within 5-10 mins of onset of her symptoms on her left side[.] [S]he went to lay down, [and] her symptoms of right side face and arm numbness/tingling and speech improved within 2 hours[.]  [Her] HA continued[.]  [S]he did not go to the ER[.] [S]he went to go see her PCP that following Monday, [and] she was told that she had a "mini stroke" by her PCP and was started on Aspirin 81 mg.

16

> November 2021, [Straub] reported her headache frequency had decreased to only 3 events per month.
>
> In 2022, [Straub] noted some uncontrolled symptoms and her medications were adjusted. However, the record shows little evidence of any further complaints of symptoms or neurological treatments dated after December 2022, despite those records having been updated in December 2023, suggesting [Straub] had good benefit from her change in medications.

*Id*. at 31–32.

The ALJ further considered the medical opinions in the record. *Id*. at 32–33. He did not find persuasive the March 2023 opinion of the state agency consultant that Straub was capable of light work. *Id*. at 33. Rather, he concluded that Straub was limited to sedentary work. *Id*.

The ALJ found persuasive the June 2022 opinion of the state agency medical consultant that Straub was capable of no more than a range of sedentary work with

---

> She states that he has had the right face and arm numbness/tingling/weakness before with her migraines but never had word finding difficulties.

*Id*. at 1096. When read in context, the medical record that the ALJ cites for the proposition that after November 2019, Straub reported having no further migraine symptoms until January 2021, does not support that proposition. Rather, it supports a much narrower proposition—that after November 2019, Straub reported that she did not have an episode like she experienced on November 29, 2019. And there are references in the record to Straub having headaches between November 29, 2019, and January 2021, *see, e.g., Admin. Tr.* 1095, 1104–06, which her neurologist characterized as migraines, *see Admin. Tr.* at 1104 (noting that her headaches have improved and "are now heading towards becoming episodic migraine, migraine with aura, not intractable wo status migrainosus."); 1094 ("Her headaches . . . are now episodic migraines, migraines with aura, not intractable, without status migrainosus.").

some limitations. *Id*. at 32.  That ALJ concluded that "[t]hese findings are consistent with the objective imaging showing evidence of degenerative processes in [Straub]'s cervical and lumbar spine and the environmental restrictions remain consistent with [Straub]'s need to avoid environmental triggers consistent with her diagnosis of migraine headache." *Id*.  He also concluded that "[t]he assessment is well supported by [Straub]'s presentation on intermittent examinations using a walker or cane for ambulatory assistance and impaired balance." *Id*.

The ALJ also considered the opinions of Dr. Kneifati, who completed two "Internal Medicine Examination[s]" and two "Medical Source Statement[s] of Ability to Do Work-Related Activities (Physical),"[9] one on May 16, 2022, and the other on March 2, 2023. *Id*.  The ALJ found Dr. Kneifati's opinions partially persuasive, and he explained the basis for that finding. *Id*.  Relevant to the claims in the instant case, the ALJ noted that Dr. Kneifati opined that Straub "had a limited tolerance for environmental conditions." *Id*.[10]

---

[9] *See Admin. Tr*. at 1237–57, 1426–40.

[10] Dr. Kneifati's opinion regarding Straub's environmental limitations in his May 16, 2022 medical source statement are not consistent with his opinion regarding Straub's environmental limitations in his March 2, 2023 medical source statement. *Compare Admin. Tr*. at 1246 *with Admin. Tr*. at 1435.  Of note, in his May 16, 2022 medical source statement, Dr. Kneifati opined that Straub was limited to "Quiet (Library)" level noise, *see id*. at 1246, but in his March 2, 2023 medical source statement, Dr. Kneifati opined that Straub could tolerate "Very Loud (Jackhammer)" level noise, *see id*. at 1435.

In making the RFC assessment, the ALJ also incorporated by reference this earlier discussion of Dr. Ledermann's opinion. *Id.* at 33.

The ALJ then summarized the reasons for his RFC assessment:

The record demonstrates [Straub] suffers from cervical and lumbar degenerative disc disease resulting in chronic pain, intermittent sensory loss, and difficulty with maintenance of gait, range of motion, and balance. To accommodate these symptoms, the undersigned limited [Straub] to sedentary work activity involving a limited capacity for postural activities and the need to avoid exposure to temperature extremes, wetness, humidity, vibration, and hazards. The record also demonstrates [Straub] suffers from migraine headaches resulting in intermittent pains and environmental sensitivities. While the undersigned notes the record shows [Straub] has demonstrated adequate control of her symptoms with sustained compliance to treatment, the undersigned limited [Straub]'s environmental tolerances in order to prevent exacerbations in the frequency and intensity of her symptoms, particularly with regard to olfactory triggers and noise.

*Id.*

### E.  Step Four.

At step four of the sequential-evaluation process, the ALJ found that Straub had no past relevant work. *Id.*

### F.  Step Five.

At step five of the sequential-evaluation process, considering Straub's age, education, work experience, and RFC, as well as the testimony of a vocational expert, the ALJ found that there were jobs—such as food and beverage order clerk,

19

telephone clerk, and stuffer/packaging machine tender—that exist in significant numbers in the national economy that Straub could perform. *Id*. at 34.

In sum, the ALJ concluded that Straub was not disabled from April 1, 2013 (which is the alleged onset date), through the date of the ALJ's decision on February 13, 2024. *Id*. at 34.  Thus, he denied Straub's claims for benefits. *Id*. at 35.

## V.  Discussion.

Straub presents two main claims: (1) the ALJ erred in evaluating her mental impairments; and (2) substantial evidence does not support the ALJ's step-three analysis regarding her migraine headaches. *Doc. 14* at 1.

We begin by addressing Straub's claim that the ALJ erred at step three of the sequential-evaluation process.  Straub contends that the ALJ failed to adequately address Listing 11.02 with regard to her headaches.  For the reasons discussed below, we conclude that the ALJ erred at step three by failing to articulate whether Straub's headaches are equivalent to Listing 11.02.  Before we address Straub's specific contentions, we set forth the standards applicable to the step-three analysis of headaches.

20

## A.  Step 3 and Headaches.

Appendix 1 of 20 C.F.R. Part 404, Subpart P ("Listing of Impairments") describes, for each major body system, impairments that the Commissioner considers to be severe enough to prevent a claimant from doing any gainful activity regardless of the claimant's age, education, or work experience. 20 C.F.R. § 404.1525(a).  "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  "[T]he medical criteria defining the listed impairments" is set "at a higher level of severity than the statutory standard." *Id*. at 532.  "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Id*. (italics in original).  "The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Id*.  If a claimant's impairment meets or is equivalent to a listed impairment, then the claimant "is *per se* disabled and no further analysis is necessary." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).  But "[i]f a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

21

"In step three, the ALJ must determine whether [the claimant's] impairment matches, or is equivalent to, one of the listed impairments." *Burnett*, 220 F.3d at 119. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Zebley*, 493 U.S. at 530 (italics in original); *see also* 20 C.F.R. § 404.1525(c)(3) ("We will find that your impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement."); 20 C.F.R. § 404.1525(d) ("To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing."). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530 (footnote omitted). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for [a] listed impairment." *Id*. at 531 (italics in original) (footnote omitted); *see also* 20 C.F.R. § 404.1526(a) ("Your impairment(s) is medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment."); 20 C.F.R. § 416.926(a) ("Your impairment(s) is medically equivalent to a listed impairment in appendix 1 of subpart P of part 404 of this

22

chapter if it is at least equal in severity and duration to the criteria of any listed impairment.").

The Third Circuit "requires the ALJ to set forth the reasons for his decision" at step three. *Burnett*, 220 F.3d at 119. The purpose of this requirement "is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett*, 220 F.3d at 120). "Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009). This is because a bare conclusion that an impairment does not meet or equal a listing "'is beyond meaningful judicial review.'" *Burnett*, 220 F.3d at 119 (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)). But the ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis." *Jones*, 364 F.3d at 505. And the ALJ's decision must be "read as a whole[.]" *Id*.

Consistent with the principle that the ALJ's decision must be read as a whole, "where an ALJ's conclusion at step three is not adequately articulated, courts may review the ALJ's entire decision before determining whether remand is required." *Izalia V. v. O'Malley*, No. 4:22-CV-1819, 2024 WL 4505469, at *5 (M.D. Pa. Oct. 16, 2024). "In other words, 'the Court must determine whether the evidentiary discussion—regardless of its placement in the ALJ's decision—

23

supports meaningful judicial review of the challenged Step Three finding(s) pursuant to the applicable legal standards." *Fewell v. O'Malley*, No. 1:23-CV-00865, 2024 WL 4182115, at *4 (M.D. Pa. Aug. 19, 2024) (quoting *Gonzalez v. Saul*, No. 1:17-CV-02524 (PAZ), 2019 WL 13401378, at *12 (D.N.J. Oct. 31, 2019)), *report and recommendation adopted*, 2024 WL 4173790 (M.D. Pa. Sept. 12, 2024).  In this vein, the Social Security Administration issued a Social Security Ruling which, among other things, sets forth articulation requirements for step 3 findings about medical equivalence. Soc. Sec. Ruling 17-2p, *Titles II & XVI: Evidence Needed by Adjudicators at the Hearings & Appeals Council Levels of the Admin. Rev. Process to Make Findings About Med. Equivalence*, 2017 WL 3928306 (S.S.A. Mar. 27, 2017) ("SSR 17-2p").  SSR 17-2p provides that if an ALJ "believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the [ALJ] is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id*. at *4.  Rather, "[g]enerally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding." *Id*.  And "[a]n ALJ's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court

24

to determine the basis for the finding about medical equivalence at step 3." *Id*.

"Nonetheless, for an unarticulated medical equivalency finding to be upheld[,] an

ALJ's decision as a whole 'must still enable this court to follow the ALJ's

reasoning in determining that Plaintiff's impairment is not the medical equivalent

of the listing' Plaintiff alleges on appeal" and "[i]f it does not, remand is required."

*Izalia V.* 2024 WL 4505469, at *5.

There is no listing for migraine headaches. *See Soc. Sec. Ruling 19-4p, Titles*

*II & XVI: Evaluating Cases Involving Primary Headache Disorders*, 2019 WL

4169635 (S.S.A. Aug. 26, 2019) ("SSR 19-4p") ("Primary headache disorder is not

a listed impairment in the Listing of Impairments (listings)."). But "SSR 19-4p

explains how primary headache disorders, like migraines, are evaluated at step

three." *Tyson v. Kijakazi*, 1:21-CV-855, 2022 WL 3975002, at *10 (M.D. Pa. July

25, 2022), *report and recommendation adopted*, 2022 WL 3971041 (M.D. Pa.

Aug. 31, 2022)). SSR 19-4p provides that "a primary headache disorder, alone or

in combination with another impairment(s)" may "medically equal[] a listing." *SSR*

*19-4p*, 2019 WL 4169635 at *7. And it identifies Listing 11.02, which addresses

epilepsy, as "the most closely analogous listed impairment" for a primary headache

disorder. *Id*. More specifically, SSR 19-p4 provides that "[w]hile uncommon, a

person with a primary headache disorder may exhibit equivalent signs and

limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive

25

seizures), and we may find that his or her MDI(s) [medically determinable impairment(s)] medically equals the listing." *Id.* "Thus, an ALJ should look to Listings 11.02B and 11.02D in assessing whether a claimant's migraine headache impairment medically equals a listing." *Tyson*, 2022 WL 3975002 at *10.

"Listing 11.02B describes dyscognitive seizures 'occurring at least once a week for at least 3 consecutive months . . . despite adherence to prescribed treatment.'" *Falardo-Weller v. Kijakazi*, NO. 3:22- CV-01026, 2023 WL 6119101, *6 (M.D. Pa. Sept. 18, 2023) (quoting 20 C.F.R. Part 404, Subpart P, App.1, § 11.02B). "To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B," the ALJ should consider the following factors:

> [(1)] A detailed description from an AMS [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); [(2)] the frequency of headache events; [(3)] adherence to prescribed treatment; [(4)] side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and [(5)] limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4P, 2019 WL 4169635 at *7.

Listing 11.02D, on the other hand, "requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one" of the following areas: "[p]hysical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself." *Id.* In evaluating 11.02D, the ALJ should consider the same factors—set forth above—for considering 11.02B. *Id.*

**B. The ALJ did not adequately articulate his reasoning in connection with the analysis of Straub's headaches.**

Straub contends that the ALJ failed to adequately address Listing 11.02 in accordance with SSR 19-4p. We agree.

The ALJ's step three analysis regarding Straub's migraine headaches is brief. It reads in full:

> There is no Listing for migraine headaches. However, pursuant to Social Security Rule 19-4p, the undersigned considered [Straub]'s headaches under equivalence to Listing 11.02. The record does not provide sufficient information regarding the frequency or presentation of [Straub]'s headaches to demonstrate symptoms equivalent to the requirements of Listing 11.02. Additionally, no medical source opined [Straub]'s headaches were equivalent in severity to Listing 11.02; [Straub] does not allege equivalence to the Listing; and there is insufficient evidence to suggest an opinion on equivalence to Listing 11.02 need be developed.

*Admin. Tr.* at 28–29.

27

Straub contends that the ALJ failed to adequately consider whether her migraines are medically equivalent to Listing 11.02 because he failed to address the factors set forth in SSR 19-4p.  And, according to Straub, the record demonstrates that she suffers from debilitating headaches. *Doc. 14* at 18.  In this regard, Straub cites a January 2021 neurological evaluation. *Id*.  The report from that evaluation notes that Straub reported that she currently was "having around 2 HA days/week, around 6-8 HA days/month, lasting about 2 hours with tx." *Admin. Tr.* at 1095.  It further noted that she reported suffering from six to eight headache days a month[11] in October, November, and December 2020.[12] *Id*.  She was prescribed Ubrelvy and told to continue Topamax. *Id*. at 1094–95.  Straub further asserts:

> In July 2021, Ms. Straub reported daily headaches for the past 1.5 weeks.  The pain started in her neck on the right and radiated to the back of her head.  Prior to that, she was having 2 headaches [] per week, lasting around 2 hours.  In November

---

[11] In her brief, Straub refers to six to eight headache days a week. *Doc. 14* at 18.  And the underlying record also refers to six to eight headache days a week for October and November, and six to eight headache days per month for December. *Admin. Tr.* at 1095.  Because there are only seven days in a week, we assume that what was meant was six to eight headache days a month.

[12] In her brief, Straub refers to these months as October, November, and December of 2019.  But given that the medical record she cites is from January 2021, and after referencing October, November, and December, it states that Straub reported "4 HA days so far" for January, *see Admin. Tr.* at 1095, it appears that the references in the record to October, November, and December are references to October, November, and December of 2020.

2021, Ms. Straub reported episodic migraines and cervicogenic headaches. She detailed suffering from 3 headaches per month. She was prescribed Relpax, Ubrelvy, and Topamax, and Rizatriptan was discontinued. During the May 2022 consultative examination, Ms. Straub described suffering from migraine headaches associated with nausea, light sensitivity, and sound sensitivity. Dr. Kneifati diagnosed migraine headache and opined that Ms. Straub was limited to quiet (library) level of noise. At the hearing, Ms. Straub testified that she suffered from migraine headaches 1-2 times a week, lasting at least a couple of hours. For her migraine headaches, she was prescribed Ubrelvy, Flexeril, and Aimovig injections.

*Doc. 14* at 19 (citations to the record omitted).

The Commissioner contends that the ALJ's discussion was sufficient because he addressed Straub's headaches in connection with his RFC assessment. We agree with the Commissioner that we must look to the ALJ's decision as a whole, including his discussion in connection with the RFC assessment. But reading the ALJ's decision as a whole—including his discussion of Straub's headaches in connection the RFC assessment—we nevertheless conclude that the ALJ's step three analysis is beyond meaningful judicial review.

Here, in connection with his RFC assessment, the ALJ acknowledged that Straub "reported that she suffers weekly headaches resulting in severe pain, nausea, and vomiting[,]" and "her events last a couple of hours each and require her to lay down in a quiet location." *Admin. Tr.* at 29. But he concluded based on Straub's medical records—which as set forth by the ALJ included visits to the emergency room and acute care facilities, the prescription and use of several

29

medications (both preventative and abortive) for her migraines, and periods of fewer headaches and periods of "uncontrolled symptoms"—that she had "good benefit from her change in medications" and "adequate control of her symptoms with sustained compliance to treatment." *Admin. Tr.* at 31–33.  And the ALJ asserted that he "limited [Straub]'s environmental tolerances in order to prevent exacerbations in the frequency and intensity of her symptoms, particularly with regard to olfactory triggers and noise." *Id*.  But the ALJ does not address the requirements of Listing 11.02B or 11.02D or the factors set forth in SSR 19-4p.

For example, the ALJ does not discuss whether the frequency of Straub's migraines meet the frequency requirements of 11.02 and 19-4p, which are for 11.02B, "at least once a week for at least 3 consecutive months despite adherence to prescribed treatment," and for 11.02D, "at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment." *SSR 19-4p*, 2019 WL 4169635 at *7.[13]  In fact, although the ALJ found that Straub's migraines were

---

[13] In addition to the considerations of the factors relevant to both 11.02B and 11.02D, as the summary of SSR 19-4p set forth earlier shows, to be medically equivalent to 11.02D, a marked limitation is required in one of the five following areas: "[p]hysical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself." *SSR 19-4p*, 2019 WL 4169635 at *7.  When discussing the paragraph B criteria in connection with his step two finding as to Straub's mental impairments, the ALJ found that Straub did not have a marked limitation in the latter four of these areas. *See Admin. Tr.* at 27.  But the ALJ did not address whether Straub has a marked limitation in "physical functioning" when

a sever impairment, it is unclear how many migraines the ALJ thinks Straub suffers even though she purportedly achieved "good benefit from her change in medications" and "adequate control of her symptoms with sustained compliance to treatment." *See Admin. Tr.* at 32, 33.

Further, the ALJ does not address the severity and duration of Straub's migraines or whether she suffers side effects from her treatment.  And although the ALJ acknowledged that Straub asserted that her migraines "require her to lay down in a quiet location," *Admin. Tr.* at 29, he nevertheless did not discuss what limitations in functioning she experiences during a migraine.

In sum, the ALJ's step three analysis—even when coupled with his later RFC assessment—fails to adequately address whether Straub's migraine headaches are equivalent to Listing 11.02 in accordance with SSR 19-4p, which "prevents the Court from conducting a meaningful, albeit deferential, review." *Falardo-Weller*, 2023 WL 6119101 at *8, *9 (finding the ALJ's analysis regarding step 3 and Listing 11.02 to be deficient, vacating the Commissioner's decision, and remanding the case for further proceedings); *see also Amy B. v. Bisignano*, No. 1:24-CV-02091, 2026 WL 567656, at *8 (M.D. Pa. Jan. 28, 2026) (recommending that the Commissioner's decision be vacated because the ALJ failed to evaluate on the record the applicability of 11.02B and 11.02D, thus preventing the court from

---

he addressed the paragraph B criteria because that is not one of the paragraph B criteria.

conducting a meaningful review), *report and recommendation adopted*, 2026 WL 565809, at *1 (M.D. Pa. Feb. 27, 2026); *Fewell*, 2024 WL 4182115, at *6 (same), *report and recommendation adopted*, 2024 WL 4173790 (M.D. Pa. Sept. 12, 2024); *Tyson*, 2022 WL 3975002, at *15 (same), *report and recommendation adopted*, 2022 WL 3971041 (M.D. Pa. Aug. 31, 2022).

The question then is whether the ALJ's error was harmless.  "Ordinary harmless error review, in which the appellant bears the burden to demonstrate harm, is applicable to administrative appeals." *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016).  Thus, a claimant must explain "'how the . . . error to which he points could have made any difference.'" *Id.* (quoting *Shinseki v. Sanders,* 556 U.S. 396, 413 (2009)).  "An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).  Although an error may be harmless, we must be mindful that "'[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.'" *Fargnoli*, 247 F.3d at 44 n.7 (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

As set forth above, Straub has cited to evidence that she contends shows that her migraines are debilitating and that may support application of the listing. *See*

*doc. 14* at 18–19.  Given this, we cannot say that the ALJ's error was harmless, and we will vacate the ALJ's decision.

### C.  Other Claims.

Given our conclusion that the Commissioner's decision must be vacated based on the ALJ's error at step 3, we will not address Straub's remaining claims of error.  "Plaintiff's additional claims of error may be remedied through the case's treatment on remand." *Brown v. Saul*, No. CV 3:18-1619, 2020 WL 6731732, at *7 (M.D. Pa. Oct. 23, 2020), *report and recommendation adopted*, 2020 WL 6729164, at *1 (M.D. Pa. Nov. 16, 2020).  "A remand may produce different results on these claims, making discussion of them moot." *Id.*

### D.  Remand is the appropriate remedy.

Because the ALJ's decision is not supported by substantial evidence, the question then is whether the court should remand the case to the Commissioner for further proceedings or award benefits to Straub.  We conclude that remand is the appropriate remedy.

Under sentence four of 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Thus, although a remand is often the

appropriate remedy, the court may also enter an order awarding the claimant benefits. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 358 (3d Cir. 2008) (remanding the case to the district court with directions to enter an order awarding the payment of benefits); *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (same); *Podedworny v. Harris*, 745 F.2d 210, 223 (3d Cir. 1984) (same).  But an "award [of] benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221–22.  Whether there has been excessive delay and/or prior remands also bears on whether to award benefits or to remand for further proceedings. *Diaz v. Berryhill*, 388 F. Supp. 3d 382, 391 (M.D. Pa. 2019).  "Thus, in practice any decision to award benefits in lieu of ordering a remand for further agency consideration entails the weighing of two factors: First, whether there has been an excessive delay in the litigation of the claim which is not attributable to the claimant; and second, whether the administrative record of the case has been fully developed and substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id.*

Here, although Straub's claims have been pending since 2021, we cannot say, at this point, that any delay in the litigation of Straub's claims has been excessive.  Moreover, we cannot say that substantial evidence on the record as a

34

whole shows that she is disabled and entitled to benefits.  Thus, we will remand the case to the Commissioner for further proceedings.

## VI.  Conclusion.

For the foregoing reasons, we will vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  An appropriate order follows.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge